UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ROSS MARGHERITA,

                     **Plaintiff,**

          -against-

FEDEX EXPRESS, FEDEX CORPORATION,
FEDEX EXPRESS CORPORATION, and
JOSEPH RANDALL,

                 **Defendants.**
----------------------------------------------------------------X

07 CV 4826 (NG)(RER)

**OPINION & ORDER**

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  **OCT 20 2011**  ★

**BROOKLYN OFFICE**

**GERSHON, United States District Judge:**

       Plaintiff Ross Margherita brings this action against defendants FedEx Corporation ("FDX"), Federal Express Corporation ("FedEx") and James Randall ("Randall") pursuant to the Americans with Disability Act of 1990, 42 U.S.C. §§ 1201 *et seq.* ("ADA"), the New York State Human Rights Law (N.Y. Exec. L. 296(1)(a) ("NYSHRL")), and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-107(1)(a) ("NYCHRL")). He also brings claims of negligent and intentional infliction of emotional distress. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and also move to strike certain portions of plaintiff's affidavit and exclude the affidavit of plaintiff's expert, Dr. Kramer.

## FACTS

       The following facts are undisputed unless otherwise noted. FDX is a holding company that is the parent company to FedEx. Since August 1989, plaintiff has been employed as a freight handler at FedEx airline, operating out of John F. Kennedy International Airport. Plaintiff's job requires the loading and unloading of aircraft, the efficient movement of

heavyweight freight to and from aircraft, and ensuring the safe, efficient buildup and breakdown of pallets.

It is undisputed that plaintiff is hearing impaired and has a speech impediment. However, other than limitations in his ability to use the telephone, which is not a requirement for his job, his hearing impairment did not render him incapable of performing any of his job functions. It is further undisputed that plaintiff has never been issued any discipline or safety infraction by FedEx.

Mike Collins was plaintiff's manager from January 2004 through March 2006, and Frank LaScala became plaintiff's manager in March 2006. Because of a conflict with another co-worker, Joseph Randall was transferred to plaintiff's group, the FedEx Mail group. When he was transferred, Randall retained his official title of "team leader," but, other than the occasional employee working overtime, no one was assigned to his supervision. Plaintiff reported to Carlo Cantenola, who, according to FedEx, was at all times plaintiff's team leader. Although it is ultimately immaterial to the dispute between the parties, plaintiff claims that, when Cantenola was absent, Randall acted as plaintiff's team leader. A team leader has the authority to direct the work of other members of his group; for instance, if there is a change in the volume of work, a team leader has the authority to redistribute the workload to members of the group. Randall and plaintiff were in a group of 30 employees who, in 2005, reported to Collins. It is undisputed that Randall worked with plaintiff from the times of 5:30 a.m. to 8 a.m., that he was not plaintiff's manager, had no authority to discipline plaintiff, never counseled or issued him any discipline, and did not complete any performance reviews of plaintiff.

Although FedEx asserts that Randall was never disciplined or suspended by FedEx for any reason, plaintiff contends, and the record supports, that Randall was issued written

2

counseling in 1999 for displaying "unprofessional behavior" at a working group meeting, and that, in 2001, he was issued a warning letter for bringing false charges of insubordination and sexual harassment against a co-worker. In the 2001 incident, Randall reported that a peer of his had been insubordinate and sexually harassing of a female Senior Manager. When the charges were investigated, it was determined that Randall's sexual harassment charges were false, although he disagreed with the outcome of the investigation, and signed the warning letter "under protest."

The record reflects that, in November 2005, safety concerns were raised with regard to plaintiff. Collins, Cantenola, and Randall all observed plaintiff, while driving a "tug," strike the "deck" with such force that the collision produced a loud noise that drew the attention of all three. After witnessing "the crash," Randall and Cantenola had a meeting with Collins, in which Randall related three other instances of unsafe conduct on the part of plaintiff. In one instance, plaintiff moved his tug at the request of a team leader, John Giamondo, without first checking to make sure it was safe to proceed, in contravention of standard safety procedures. Randall was standing between two attached dollies at the back of the tug, and he had to jump out of the way to avoid being dragged under. There was also a can of mail on the dolly that had not been properly "locked down." Randall had to run after plaintiff, shouting in order to get him to stop, so that the can could be secured. Immediately following this incident, Randall made a verbal complaint to Cantenola, but did not file a written complaint. Although plaintiff denies that these events occurred, he relies on the fact that there were no written warnings issued to him at the time of the events, but he does not present any affirmative evidence (other than his own affidavit) to support his claim that the accounts are fabricated.

3

Following his conversation with Randall, Collins observed another safety violation in which plaintiff was driving the wrong way in a "drive lane." Collins recounts that, after plaintiff did not heed hand gestures or verbal warnings to stop the tug, Collins had to "punch the top of the tug" to get plaintiff's attention. Plaintiff does not dispute that this incident occurred but contends that he was parking in the opposite direction pursuant to instructions from another, unnamed supervisor.

In the course of his employment, FedEx conducted annual audio metric hearing tests of plaintiff and his coworkers. The annual hearing tests were conducted under controlled conditions in a "soundproof trailer." According to defendants, after safety concerns regarding the plaintiff developed, Collins contacted Johnny Lugo, a Senior Safety Specialist at FedEx. Lugo consulted with George Page, Safety Specialist Hearing Conservation, who suggested that plaintiff undergo a separate "communication test," which was a safety evaluation designed by FedEx to be administered in the work environment during operations, *i.e.*, the deck where aircraft are located. The communication test (also referred to as the "field safety assessment" or "safety assessment") was developed in 2004 by a seven person committee comprised of the director of safety, various senior managers and officials in the safety department, including two industrial hygienists.

On November 22, 2005, Collins informed plaintiff that he would be required to take the field safety assessment the following day, because there was a safety complaint made against him. At the time, Collins said, "don't worry about it, take the hearing test, you will be fine." Plaintiff Dep. at 105. FedEx argues that Collins was attempting to assure plaintiff that his job was not in jeopardy. However, plaintiff disputes that interpretation and contends that his job was

4

in fact in jeopardy.[1]  After plaintiff pressed Collins for the information, Collins acknowledged that it was Randall who made the safety complaint.  It is undisputed that, after learning the communications test would take place the next day, plaintiff went about his business as usual and completed his shift.

On November 23, 2005, Lugo administered the test with Collins' participation.  Lugo explained that the test involved a series of commands given at different distances, 15, 30, and 45 feet; Lugo called out commands, and plaintiff was to respond.  The first attempt at test administration was conducted on the "ramp" with Collins and Lugo.  The test took approximately 30-40 minutes to conduct, but, because of inconclusive results, Collins informed plaintiff that it would have to be administered again.

A second attempt to administrate the test occurred on November 30, 2005.  It was conducted next to an aircraft, approximately 100 feet from the location of the first attempt.  There is a dispute as to whether the engines were running on the nearby plane.  After 10 minutes, the second attempt was discontinued because Collins, who was standing next to plaintiff, could not hear the instructions being given.  Collins testified that plaintiff was upset about having to take the test and, in response to a question about whether plaintiff was crying during the administration of the test, Collins testified that "there was water out of his eyes, yes, but he went through with the test."

After the second attempt, plaintiff "went about his business" and was allowed to return to his regular duties at FedEx.  Two days following the second attempt, after completing his shift, plaintiff was in severe pain and could not move his neck; plaintiff attributes this to stress.  After consulting his primary physician and a specialist, plaintiff was transported to the emergency room.  Plaintiff went on leave and did not return to FedEx until March 1, 2006. While on leave,

---

[1] This dispute is ultimately immaterial because plaintiff did not in fact lose his job.

5

plaintiff received therapy from a licensed clinical social worker in order to address his anxiety and depression.

On December 16, 2005, plaintiff submitted a letter to management complaining of harassment by Randall. In his December 2005 letter, plaintiff maintained that Randall gossiped about plaintiff's disability following the safety assessment. "Since [the safety assessment] Mr. Randall has been spreading rumors about my handicap to other people on the ramp, as well as people at the post office." Def. Ex. 3A. Additionally, although the timing is a matter of dispute between the parties, Collins' deposition testimony supports plaintiff's position that plaintiff also made at least one verbal complaint to Collins concerning the way that Randall was treating him with regard to his disability, prior to the lodging of Randall's safety complaint. Plaintiff filed a formal internal EEO complaint on April 21, 2006. The record reflects that FedEx investigated plaintiff's complaint and, as a result, LaScala issued Randall "documented counseling" to make him aware of FedEx's policy prohibiting discriminatory behavior.

On February 26, 2006, in response to correspondence from plaintiff's attorney, FedEx requested that plaintiff engage "in the interactive process with the Company as outlined by the Americans with Disabilities Act." The letter went on to request that, as part of the interactive process, plaintiff "take part in a field safety assessment administered by our Safety Specialist which is designed to evaluate your client's ability to safely perform the essential functions of his position." The letter indicated that, on his return, plaintiff would be placed on a temporary assignment that would not require the operation of ground support equipment (GSE). On March 6, 2006, plaintiff's attorney proposed that plaintiff be permitted to "perform the duties of the 'temporary' assignment on a permanent basis, without any reduction in salary, grade or seniority,

6

pending the outcome of the EEO proceeding, thereby eliminating the need for the repeat 'field safety assessment' at this time."[2]  FedEx agreed to this request.[3]

It is undisputed that, since his return to work on March 1, 2006, plaintiff's duties include moving freight containers around the warehouse and onto trucks without the use of GSE and working at the post office; five days after returning from leave, plaintiff's hourly rate was increased from $ 19.92 to $ 20.52; and the number of hours plaintiff works has not changed.  No safety infractions have been issued against plaintiff.  The record reflects that FedEx regularly disciplines and even terminates employees for safety infractions.  From January 1, 2005 to May 4, 2009, 24 disciplinary letters were issued for a range of safety violations, and two employees were fired for safety violations at the JFK airport location.

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment is appropriate where the "movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the

---

[2] This would indicate that an EEO complaint had already been filed, although the record reflects that plaintiff filed his formal internal EEO complaint later, on April 21, 2006. Def. Ex. 3A.

[3] Although plaintiff did not bring this case as a reasonable accommodation claim, the record also reflects that on March 15, 2006, plaintiff filed a formal request for accommodation detailing similar terms and that FedEx acceded to that request:

"If management does not want to allow me to operate ground equipment, I would request the accommodation of (1) being assigned on a full time basis to perform the same work I presently perform on a part-time basis at the post office (located at the airport) or, in the alternative, (2) being allowed to remain in my present position and perform all the work of that position which does not require my operation of ground equipment.  I do reserve the right to pursue my EEO Complaint which seeks, in part, full restoration to all my regular job duties, including operation of ground equipment and my acceptance of any accommodation would be without prejudice to such right." Def. Ex. 3A.

7

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (1986), but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586-8 (emphasis removed).

When intent is at issue, district courts must use caution resolving motions for summary judgment in discrimination cases since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Therefore, summary judgment remains appropriate where the standards of Rule 56 have been met. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

**I.    ADA Claim**

The ADA "prohibits discrimination against any qualified individual with a disability because of the disability of such individual in regard to . . . employment." *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir.2006) (internal quotation omitted). Claims of

employment discrimination under the ADA are governed by the three-step burdenshifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *see Regional Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48-49 (2d Cir. 2002). Thus, plaintiff must first establish a *prima facie* case of discrimination; defendants must then come forward with a legitimate, non-discriminatory reason for the adverse employment action; then plaintiff must demonstrate that this reason is a pretext and that the true motive was discriminatory. *Id.*

In order to establish a *prima facie* case of disability discrimination the plaintiff must show that: (1) the defendants are subject to the ADA; (2) he is disabled within the meaning of the ADA; (3) he can perform the essential functions of his job with or without a reasonable accommodation; and (4) he was subject to an adverse employment action because of his disability. *See Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998); *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003). For the purposes of summary judgment, defendants concede the first three prongs of the *prima facie* case but dispute only whether plaintiff was subjected to an adverse employment action.

A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment such as a "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Curran v. All Waste Systems, Inc.*, 213 F.3d 625, *3 (2d Cir. 2000) (quoting *Galabya v. New York City Bd. Of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "To be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*

9

Here, when plaintiff refused to undergo the field safety assessment a third time, his responsibilities were modified, at his lawyer's request, so as to preclude the use of ground support equipment. Plaintiff's job title did not change, and he continues to operate as a freight handler and work in the post office. He receives the same pay. In fact, shortly after the modification of plaintiff's responsibilities, he was given a slight pay increase. Plaintiff argues that the modification of his responsibilities was adverse to him because working on the ramp without the use of GSE entails more manual labor and that, as a result, he developed a hernia. However, there is no evidence in the record to support the conclusion that plaintiff's hernia was a result of his modified employment responsibilities. In light of the fact that plaintiff maintained his job title, with the same pay, and received a pay increase following the change in his responsibilities, the record cannot support the conclusion that plaintiff suffered an adverse employment action as a result of the modification to his responsibilities.

Even assuming that plaintiff is able to sustain a *prima facie* case, FedEx proffered a legitimate, non-discriminatory reason for the modification of plaintiff's responsibilities. Although plaintiff disputes some of the instances, there were allegations of safety infractions on the part of plaintiff, one of which he acknowledges. Plaintiff acknowledges driving in the wrong direction in a "drive lane" and disputes only the cause of the unsafe behavior. Whatever the cause, plaintiff does not address the concern that his supervisor had to use numerous methods of getting plaintiff's attention before he was finally able to communicate to plaintiff to stop driving in the "wrong" direction. Further, the field safety assessment was developed in 2004 by a committee of the company's safety officers to evaluate an employee's ability to operate safely in the work environment. There is no evidence in the record that the test was in any way

10

discriminatorily targeted towards plaintiff rather than a legitimate component of FedEx's safety protocol. FedEx has a legitimate business reason to maintain a safe work environment.

Plaintiff argues that the field safety test is a medical examination under 42 U.S.C. § 12112 (d)(4)(A), which provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

However, plaintiff ignores 42 U.S.C. § 12112 (d)(4)(B), which provides in relevant part that: "A covered entity may make inquiries into the ability of an employee to perform job-related functions."

Plaintiff relies on an expert report from Dr. Kramer to challenge the validity of the safety assessment as audiologically and methodologically unsound. Defendant moves pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude that report. Defendant's *Daubert* motion is unnecessary to address because, even taking it into consideration, Dr. Kramer's affidavit does not affect the ultimate decision in this case, which is whether FedEx engaged in intentional discrimination. The first two tests were inconclusive, and plaintiff refused to take a third administration of the test, so the results of the test were never used against plaintiff. There is no showing that anything FedEx did injured plaintiff. Plaintiff argues that being required to take the safety assessment injured him. However, the essence of plaintiff's claim is that he found the test humiliating and that he was traumatized by having to take the test. Plaintiff does not claim that he was being compelled to undergo a medical examination that would reveal information regarding the nature of his disability that was not already known to FedEx, thereby placing him in the position of being discriminated against on the basis of his

11

disability. Plaintiff takes issue with the way that the test was administered, but he does not dispute that FedEx was requiring the test specifically as a safety assessment.

This case involves a safety assessment conducted by a work place safety officer, and not a medical examination by a doctor. In contrast, Second Circuit cases analyzing the legitimate business reason exception concerning medical inquiries typically involve employer requests for medical examinations or documentation. *See e.g., Conroy v. New York State Dep't of Corr. Serv.*, 333 F.3d 88, 95 (2d Cir. 2003) (permitting employer requirement of general medical diagnosis); *Rosenquist v. Ottaway Newspapers, Inc.*, 90 Fed. Appx. 563 (2d Cir. 2004) (permitting employer requirement of independent medical examination); *Delson v. Mineta*, 144 Fed. Appx. 136 (2d Cir. 2005) (permitting employer request for medical documentation); *Gajda v. Manhattan and Bronx Surface Transit Operating Auth.*, 396 F.3d 187 (2d Cir. 2005) (permitting employer request for HIV-related laboratory tests). It should also be noted that FedEx was not making an inquiry as to whether plaintiff had a disability. Plaintiff participated in annual hearing testing, and plaintiff's hearing impairment was known to FedEx. FedEx's inquiry concerned plaintiff's ability to operate safely in the work environment. Even assuming the medical examination standards, as set forth in *Conroy*, FedEx had a reasonable basis for requiring plaintiff to demonstrate his ability to operate heavy machinery safely in the airport environment, especially given eyewitness observations by supervisors of safety violations that could be reasonably related to plaintiff's disability.

Plaintiff cannot demonstrate that FedEx's proffered reason is a pretext and that the true motive was discrimination. FedEx's proffered reason for asking plaintiff to take the safety assessment is that safety violations were observed by plaintiff's managers and a co-worker reported a safety violation. Plaintiff does not contest that Randall reported a safety violation to

plaintiff's supervisor, Collins. Instead, plaintiff argues that FedEx should not have credited Randall's allegation because he had a history of exaggeration and of making false allegations in other contexts. Collins admitted in his deposition that he had heard from "any number of people" that Randall "had a tendency to exaggerate." To question whether or not FedEx was right to believe Randall misses the point. Other than the contention that Randall made a false sexual harassment claim in the past, plaintiff does not submit any evidence that Randall was motivated by discriminatory animus rather than a sincere concern about his safety. Further, Collins and Cantenola also witnessed unsafe practices. Collins responded by notifying the safety officer and seeking guidance regarding the most appropriate way to proceed. There is no evidence that Collins was motivated by discriminatory animus. In fact, in his deposition testimony, plaintiff remarked that he had good relationships with his managers and that they never made any offensive comments to or about him.[4]

Although plaintiff disputes that *some* of the reported safety violations occurred, he does not produce any evidence that would create a genuine issue of fact to demonstrate pretext or a discriminatory motive on the part of his employer. Because plaintiff cannot show that FedEx's reason for asking plaintiff to undergo a safety assessment before continued use of GSE was pretextual and that the real motive was discrimination, plaintiff cannot defeat summary judgment.[5] Further, it is unclear whether plaintiff has abandoned his Rehabilitation Act claims,

---

[4] Portions of plaintiff's affidavit recanting his deposition testimony to this effect may not properly be considered on this motion. *Estate of Hamilton v. City of New York*, 627 F.3d 50 (2d Cir. 2010) (*citing Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.")).

[5] Although plaintiff appears to have abandoned the hostile work environment claim alleged in his amended complaint, it should be noted that a failure to adduce evidence sufficient to draw an inference of discrimination is also fatal to that claim. To make out a hostile work environment claim, a plaintiff must show that his workplace is "permeated with discriminatory intimidation,

13

but, to the extent that plaintiff is also arguing claims under the Rehabilitation Act, those claims would also fail for the reasons detailed above.

## II. New York State Claims

Plaintiff's NYSHRL claims fail for the same reasons that the federal claims fail.[6] In any event, the NYSHRL claim against Randall must be dismissed because plaintiff cannot show that Randall was a supervisor who had ownership interest in the business, *Gentile v. Town of Huntington*, 288 F. Supp.2d 316, 321 (E.D.N.Y. 2003), or that Randall, as a peer who reported a safety violation and played no part in the decision to require the safety assessment, participated in the conduct giving rise to the discrimination claim. *Id.* at 321-22.

## III. New York City Human Rights Law

The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 (2005) (the "Restoration Act"), amended the NYCHRL to, in part, "abolish parallelism between the [NYCHRL] and federal and state anti-discrimination law." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir.2009). Therefore, the Restoration Act requires courts to review claims under the NYCHRL "independently from and more liberally" than their federal counterparts. *Id.* (citation omitted). Under the Restoration Act, "[i]nterpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of [NYCHRL], viewing similarly worded provisions of federal and state civil rights laws as a floor below which the [NYCHRL] cannot fall." *Id.* (citing Restoration Act § 1). Nonetheless, Title VII's analytical framework continues to apply to NYCHRL claims. *See Waltzer v. Triumph Apparel Corp.*, No.

---

ridicule, and insult that is sufficiently pervasive to alter the conditions of victim's employment." *Brennan v. Metropolitan Opera Ass'n*, Inc., 192 F.3d 310, 318 (2d Cir. 1999). Plaintiff has not proffered any evidence that his workplace was permeated with discriminatory animus.

[6] Analysis of NYSHRL claims are governed by the same standards as those that apply in federal civil rights cases, including the ADA. *See* Kemp *v. Metro-North R.R.*, 316 Fed. Appx. 25 (2d Cir. 2009).

09 Civ. 288, *8, 2010 WL 565428 (S.D.N.Y. Feb. 18, 2010); *Bernard v. J.P. Morgan Chase Bank*, No. 08 Civ. 4784, 2010 WL 423102, at *9,*15 n. 6 (S.D.N.Y. Feb. 5, 2010), *aff'd*, 408 Fed. App'x 465 (2d Cir.2011).

One effect of the 2005 amendment is that the requirement that an adverse employment action be materially adverse to the plaintiff has been eliminated. *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 70 (1st Dep't 2009). Discrimination in "any manner" is now prohibited by the City HRL. *Id.* at 70; N.Y.C. Admin. Code § 8–107. Nonetheless, a plaintiff must still link the adverse employment action to a discriminatory motivation. *Williams*, 61 A.D.3d at 71-72. Where plaintiff fails to do so, his claims under the City HRL fail. *Id; see also Joseph v. New York City Dep't of Corr.*, No. 10-CV-1265, 2011 WL 1843162, * 9 (E.D.N.Y. May 13, 2011). Here, as discussed above, plaintiff has failed to allege any facts giving rise to an inference of discrimination. For that reason, his City HRL claims must fail.

## IV. Negligent and Intentional Infliction of Emotional Distress

First, under New York law, plaintiff's intentional infliction of emotional distress claim is subject to a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215 (3); *Patterson v. Balsamico*, 440 F.3d 104, 112 (2d Cir. 2006). Plaintiff filed this suit on November 19, 2007, and his claim accrued no later than November 30, 2005, the day of the second attempt to conduct the safety assessment. Accordingly, the claim is time-barred and must be dismissed.

Plaintiff's claim for negligent infliction of emotional distress is subject to a three-year statute of limitations and is therefore timely. N.Y. C.P.L.R. § 214. However, under New York law, plaintiff's allegations are not sufficient to state a claim for negligent infliction of emotional distress. Plaintiff alleges that defendants intentionally targeted him for discrimination, and intentional conduct cannot support a claim of negligence. *See Naccarato v. Scarselli*, 124 F.

Supp.2d 36, 45 (N.D.N.Y. 2000) (collecting cases and dismissing plaintiff's claim for negligent infliction of emotional distress premised on intentional conduct).

## CONCLUSION

Defendants' motion for summary judgment dismissing all claims is granted as is defendants' motion to strike portions of plaintiff's affidavit. Since plaintiff was unable to adduce sufficient evidence to survive summary judgment, there is no need to determine whether the parent company of FedEx, FDX, also a defendant in this case, can be held liable for the conduct of FedEx and its employees. The Clerk of Court is directed to enter judgment accordingly.

**SO ORDERED.**

_____/s/_____
**NINA GERSHON**
**United States District Judge**

Dated: October 12, 2011
      Brooklyn, New York